UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80623-CIV-HURLEY/HOPKINS

GLEN A. TURNER,

    Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the court upon the defendant's motion for summary judgment [DE # 9]. For the reasons given below, the court will grant defendant's motion.

### BACKGROUND

This is an Employee Retirement Income Security Act of 1974 ("ERISA") case. Plaintiff Glen A. Turner ("Mr. Turner") alleges that American Airlines, Inc. ("American") denied him long-term disability benefits to which he was entitled under the American Airlines, Inc. Pilot Long Term Disability Plan (the "Plan"). As required on a motion for summary judgment, the facts described below have been viewed in the light most favorable to plaintiff as the non-moving party. *See Waters v. Miller*, 564 F.3d 1355, 1356 (11th Cir. 2009).

Mr. Turner has worked for American since 1992 as a pilot. In 2005, Mr. Turner was diagnosed with obstructive sleep apnea and began using a Continuous Positive Airway Pressure (CPAP) machine.[1] He took a leave of absence from work and obtained long-term disability

---

[1] "CPAP is a treatment that delivers slightly pressurized air during the breathing cycle. This makes breathing easier for persons with obstructive sleep apnea and other respiratory problems." U.S. Nat'l Library of Medicine & NIH, Medline Plus-Encyclopedia, "Nasal CPAP," http://www.nlm.nih.gov/medlineplus/ency/article/001916.htm (last visited April 4, 20011).

benefits under the Plan until he was cleared to return to work in October 2006. The following year, Mr. Turner again began experiencing problems with sleep apnea. In September 2007, Mr. Turner's physician, Dr. Alejandro Chediak, determined that Mr. Turner's sleep apnea treatment had become ineffective, and Mr. Turner again applied for long-term disability benefits.

In support of his application for disability benefits, Mr. Turner submitted Dr. Chediak's notes from two office visits. According to Dr. Chediak's notes from August 27, 2007, Mr. Turner had "not been fully adherent to CPAP therapy due to" complaints about "nasal dryness and repeated episodes of 'colds' mainly associated with the use of" his CPAP machine. The notes reveal that, between February 25, 2007 and August 25, 2007, Mr. Turner complied with the recommended CPAP treatment on 30 days, did not fully comply with the treatment on 36 days, and did not use CPAP therapy at all on 116 days. Dr. Chediak recommended that Mr. Turner "change mask to a Respironics ComfortGel," change the solution to "[h]umidified normal saline," get a "CT of sinuses" and a rhinomanometry, and lose weight.

Dr Chediak's notes from October 8, 2007 observed that Mr. Turner's mask "was supposed to have been changed after the last visit, but that "[r]egrettably, he ha[d] not received the new interface." The notes indicated that Mr. Turner's complaint of "nasal dryness and repeated episodes of 'colds' [had] improved and decreased in frequency" due to the use of "saline as the vehicle for humidification," but noted that Mr. Turner had "not been fully complaint with CPAP therapy and continues to inadvertently remove the mask during sleep." The notes commented that Mr. Turner had not lost weight, had not completed a CT scan, and had not scheduled a rhinomanometry.

Dr. Fanancy Anzalone, a doctor from American's Medical and Occupational Health Services Department, conducted an initial review of Mr. Turner's application for disability

2

benefits and recommended that Mr. Turner's application be denied.  In a letter to Mr. Turner dated January 21, 2008, Dr. Anzalone explained that Mr. Turner's "application for disability benefits under the Plan is incomplete due to insufficient evidence that [he] followed recommended treatment for a medical condition."  Dr. Anzalone advised Mr. Turner that he may "submit additional information within thirty days," and that the claim would be sent to the "Corporate Medical Director" for review.

In March 2008, Mr. Turner submitted notes from his January 28, 2008 visit to Dr. Chediak.  The notes reported that Mr. Turner had "been unable to tolerate using CPAP nightly.  On a typical night, about 2-3 hours after sleep onset, he inadvertently remove[d] the CPAP mask [for reasons that were] not fully clear.  He state[d] that the main cause revolves around skin irritation from the mask."  According to the notes, Mr. Turner tried using a "Respironics ComfortGel," but he could not "tolerate the larger size of the mask, [and] therefore . . . resumed treatment with the" old mask.  Nonetheless, Mr. Turner's "nasal complaints, including frequent colds," [had] improved following the utilization of saline humidification with CPAP."  Between October 28, 2007 and January 27, 2008, Mr. Turner had 26 compliance days, 18 noncompliance days, and 47 day on which he did not use the CPAP machine.  According to Dr. Chediak's notes, Mr. Turner's failure "to adequately use CPAP [was] not volitional but rather result[ed] from side effects of CPAP treatment."

On March 10, 2008, Dr. Thomas Bettes, American's Corporate Medical Director, wrote Mr. Turner a letter explaining that his "claim for benefits under the Plan [was] denied due to there being insufficient evidence of a diagnosis that indicates that [he had] an ongoing Disability as required by the Plan."  Dr. Bettes explained his decision as follows:

> In summary, your records indicate that you were initially diagnosed with sleep apnea on Sept 28, 2005 and reported to your physician nasal symptoms related to

3

> the use of CPAP in August, 2007. Usage of your CPAP is documented from Feb 25, 2007 to August 25, 2007 and which reveals 30 Compliance Days, 36 non-compliance days, and 116 days not used. Office notes from Miami Beach Pulmonologists, PA on Oct 8, 2007 reveal that the CPAP mask utilized had not been changed since the previous visit in Aug, 2007. On January 28, 2008 your physician noted that initially after your diagnosis of sleep apnea was made your 'CPAP was used with subjective beneficial effects and ease of use,' and that 'nasal complaints, including the frequent colds, have improved following the utilization of saline humidification with CPAP.' At this visit it was noted that your Compliance Days = 26, Non-compliance days =18 and Days not used = 47 from a period of time from Oct 29, 2007 until January 27, 2008. Behavioral changes icnluding weight loss, nasal CPAP, auto-titrating CPAP, BiPAP, dental appliances, and/or outpatient surgical procedures are all recognized options in the effective treatment of obstructive sleep apnea.

The letter informed Mr. Turner that he had a right to appeal the denial.

Mr. Turner submitted an appeal of the denial to American's Pension Benefits Administration Committee (the "PBAC") on August 24, 2008, along with the notes from his May 23, 2008 visit with Dr. Chediak. The notes indicate that Mr. Turner continued to have "difficulty tolerating positive pressure therapy. The pattern described as similar to that reported in the last office encounter and involves inadvertent removal of CPAP during sleep." The notes recommended that Mr. Turner switch to a bi-level positive airway pressure device "as a salvage strategy for positive airway pressure treatment of sleep apnea."

The Plan provides that, before the PBAC may issue its decision on an appeal, any "dispute as to the clinical validity of a Pilot Employee's claim of the existence of a Disability or the continuation of the illness or injury which gave rise to such Disability shall be referred to a clinical authority selected under the Agreements." In August 2008, American and the Allied Pilot Association (the "APA"), the exclusive bargaining agent for American pilots, terminated their contract with the then-existing independent clinical authority. Under their collective bargaining agreement, American and the APA were required to mutually agree on a new independent clinical authority for pilot appeals. In November 2008, the University of Texas

Medical Branch at Galveston (the "UTMB") was chosen as an interim independent clinical authority.  Shortly after, the PBAC asked a doctor at the UTMB to review Mr. Tuner's case.  Due to the effects of Hurricane Ike, however, the UTMB was unable to conduct the medical review and returned Mr. Turner's file to the PBAC on January 9, 2009.  In June 2009, after several months of identifying and interviewing potential clinics, American and the APA selected the Mayo Clinic – Rochester ("Mayo") as the interim independent clinical authority.  The PBAC requested that Dr. Clayton Cowl perform an evidence-based, forensic review of Mr. Turner's case.

Before Dr. Cowl issued his report on the clinical validity of Mr. Turner's claim, Mr. Turner submitted notes from two recent visits with Dr. Chediak.  The March 16, 2009 notes observed that Mr. Turner "claim[d] more comfort and better utilization" with the BPAP treatment and that his "diurnal symptoms of alertness ha[d] benefitted considerably."  The notes indicated, however, that that "objective numbers suggest that [Mr. Turner] is still not properly using the device," but that Mr. Turner "wonders if the device utilization counter is properly functioning."  The April 22, 2009 notes observed that "diurnal symptoms of alertness ha[d] benefitted considerably from the switch to BPAP."  Nonetheless, "the objective numbers differ[ed] substantially from that which was recorded . . . manually" by Mr. Turner.  The notes said that it "is possible that the device [was] not properly or fully tracking utilization."

On June 23, 2009, Dr. Chediak issued a report summarizing the previous year of treatment for Mr. Turner.  The report explained that, once Mr. Turner changed his treatment from CPAP to BPAP, he began experiencing "normal capacity to maintain wakefulness."  The report concluded that:

> The preponderance of the evidence, both subjective and objective, indicates normalization of prior excessive daytime sleepiness and inability to maintain

5

>wakefulness using BPAP therapy of sleep apnea. [Mr. Turner] should no longer be considered encumbered as a result of sleep apnea. Therefore, it is my considered professional recommendation that Mr. Turner be allowed to return to active flight status.

On July 24, 2009, Mr. Turner returned to work as a pilot for American.

In September 2009, Dr. Cowl completed his review of Mr. Turner's claim. In his report, Dr. Cowl opined that Mr. Turner suffered from "continued presence of sleep apnea for the dates of 8/20/2007 and beyond," but that the "recurrence of non-restorative sleep and increasing daytime somnolence [was] due to partial compliance with treatment." Because "the disability plan language suggests that noncompliance would cause the *'Pilot Employee's Disability to cease [] to exists[,]'* . . . the evidence submitted [did] not support continuation of disability as defined by Plan language for the dates in question."

On October 5, 2009, after reviewing Mr. Turner's file, the PBAC denied Mr. Turner's appeal, finding that he was not disabled as a result of his condition of obstructive sleep apnea.

## JURISDICTION

This court possesses federal subject-matter jurisdiction under 28 U.S.C. § 1331 because plaintiff's complaint raises a claim arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the Southern District of Florida.

## DISCUSSION

### A.   *Standard on Motion for Summary Judgment*

In an ERISA benefits denial case "in a very real sense, the district court sits more as an appellate tribunal than as a trial court." *See Curran v. Kemper Nat. Servs., Inc.*, 2005 WL 894840, at * 7 (11th Cir. 2005). The court "does not take evidence, but, rather, evaluates the

6

reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id.* Therefore, where, as here, "the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *See Crume v. Metropolitan Life Ins. Co.*, 417 F.Supp.2d 1258, 1272 (M.D. Fla. 2006) (citing *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999). That is, "conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable." *Id.*

### B.     *Standard of Review in ERISA Cases*

Although ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries, the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989), "established three distinct standards for reviewing an ERISA plan administrator's decision: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010). The Eleventh Circuit has expanded the *Firestone* test into a six-step analysis "for use in judicially reviewing virtually *all* ERISA-plan benefit denials" cases:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

7

>   (3) If the administrator's decision is " de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
>   (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
>   (5) If there is no conflict, then end the inquiry and affirm the decision.
>
>   (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004) (emphasis in original).

The Eleventh Circuit recently amended the sixth step of the *Williams* analysis in light of *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), which called into question the burden-shifting, heightened arbitrary and capricious standard. *See Capone*, 592 F.3d at 1195. Under the amended approach, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at 1360. Additionally, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

> 1. Step One: Was the Administrator's Decision Wrong?

Because, as discussed below, the arbitrary and capricious standard applies in this case, the court will analyze whether the denial of disability benefits was reasonable. That is, "the Court will proceed as if Defendant's decision, were it reviewable under the de novo standard, was in fact wrong." *Pinto v. Aetna Life Ins. Co.*, 2011 WL 536443, at * 9 (M.D. Fla. Feb. 15,

8

2011) (skipping the first step of the *Williams* analysis where the arbitrary and capricious standard applied).

### 2. Step Two: Did the Administrator have Discretion?

The parties do not dispute that the Plan vests the Plan administrator with discretion to review claims. Specifically, the Plan gives the administrator discretion to "determine all questions concerning the rights of Pilot Employees under the Plan, which decisions shall be final and binding upon the Employer, unless arbitrary and capricious." Therefore, the denial of Mr. Turner's claim for disability benefits would normally be reviewed under the arbitrary and capricious standard.

Mr. Turner, however, argues that the arbitrary and capricious standard should not apply in this case, because the Plan administrator failed to issue a timely decision on his appeal. According to ERISA regulations, American was required to decide Mr. Turner's appeal within forty-five days, with the possibility of a forty-five day extension if special circumstances existed and written notice was given. 29 C.F.R. § 2560.503-1(i)(1)(I), (3)(I). Here, it took American 407 days to issue its adverse decision on Mr. Turner's appeal.

Mr. Turner claims that American's failure to issue a timely appeal amounted to a "deemed denial." Mr. Turner bases his argument on a former ERISA regulation that provided that if an plan administrator's appeal decision was not timely furnished, the claim would be "deemed denied." In some circuits, "a deemed denial receives no deference upon judicial review, since the plan administrator did not in fact exercise any discretion." *Torres v. Pittston Co.* 346 F.3d 1324, 1332-33 (11th Cir. 2003). Other circuit courts have had "held that the fact that the denial occurs by operation of ERISA regulations does not alter the otherwise-applicable

9

standard of review." *Id.* The Eleventh Circuit has not taken an express position on the issue. *See id.*

However, the regulation cited by plaintiff was amended in 2000.[2] The amendments removed the words "deemed denied" and replaced them with "deemed to [be] exhausted." The current regulation provides as follows:

> the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."

29 C.F.R. § 2560.503-1(I). The current "regulation, like its predecessor, protects a claimant by insuring that the administrative appeals process does not go on indefinitely." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Insurance Plan*, 605 F.3d 789, 798 (10th Cir. 2010).

Whether, under the amended regulation, an untimely appeal decision should receive less deference upon judicial review is an issue that most circuit courts have left unresolved. *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 624 (2d Cir. 2008) ("Although amended regulations have replaced the 'deemed denied' provision with one that, upon a defendant's failure to follow regulatory time frames, deems a plaintiff's administrative remedies exhausted, see 29 C.F.R. § 2560.503-1( l ), and neither we nor any other circuit has, to our knowledge, addressed whether de novo review similarly applies under the revised regulations, we join our sister circuits in delaying resolution of the question for another day."); *Gatti v. Reliance Standard life Ins. Co.*, 415 F.3d 978, 982 (9th Cir. 2005) ("We do not address the question of

---

[2] The amendment applies to claims, such as the instant one, filed on or after January 1, 2002

whether, under the new regulation, claimants who can establish a failure to comply with the claims procedures established by ERISA regulations are entitled to de novo consideration of their claims."). However, it is likely that, in the circuits where a "deemed denial" was entitled to deference on judicial review, an untimely decision under the amended regulation would still be entitled to deference.

Under the facts of this case, the court finds that the Plan administrator's denial of Mr. Turner's appeal should be entitled to deference for several reasons. First, Mr. Turner did not file the instant lawsuit when the administrator failed to issue a timely decision, but instead waited for the administrator's decision. Thus, unlike deemed denial cases where the insurer fails to issue a decision before the claimant files suit, in this case the Plan administrator *did* issue a decision and *did* exercise discretion in denying Mr. Turner's claim. Thus, the justification for applying the *de novo* standard in many deemed denial cases – *i.e.* because the plan administrator did not actually exercise any discretion – does not apply here. *See Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 211-12 (2d Cir. 2006) (holding that a appeal decision was entitled to deference even after a procedural violation, because the "eventual decision [was an] exercise of the Fund's discretion, to which [the court] must defer").

Second, there is no record evidence that the delay in deciding Mr. Turner's appeal was the result of bad faith or negligence. The PBAC sent Mr. Turner's claim to the UTMB for review shortly after American and the APA decided that the UTMB would serve as interim independent clinical authority. Unfortunately, Hurricane Ike struck Texas and prevented the UTMB from timely reviewing his file. Subsequently, American and the APA spent several months considering new clinics. Once they finally selected Mayo, Mr. Turner's claim was sent to Dr. Cowl for review, and the month after he issued his report, the PBAC issued its ruling. The

11

record therefore shows that the delay in deciding Mr. Turner's appeal was not the result of bad faith, but instead a series of uncontrollable events. *See Finley v. Hewlett-Packard Co. Employee Benefits*, 379 F.3d 1168, 1173-74 (10th Cir. 2004); *Jesbian v. Hewlett Packard Co.*, 349 F.3d 1098, 1103 (9th Cir. 2003) (holding that deference is still due where the plan administrator is "engaged in a good faith attempt to comply with its deadlines when they lapse").

      Third, Mr. Turner was an active participant in the appeal process.  The record reveals that there were ongoing exchanges between the parties while the appeal was pending.  On October 23, 2008, the date of expiration of the 45-day review period, the PBAC sent Mr. Tuner a letting explaining that a 45-day extension would be required to complete a full and fair review of his case.  Then, on December 12, 2008, the PBAC sent Mr. Turner a letter explaining that there was a change in clinical authorities and informing him that his claim had been submitted to UTMB.  And on July 6, 2009, the PBAC sent Mr. Tuner a letter explaining that Mayo was the new independent medical authority and that his claim had been submitted to Mayo for review.  Further, Mr. Turner sent American updated medical records while the appeal was pending.  Given that the delay was not the product of bad faith, and that there was an ongoing exchange between the parties, the court finds that *de novo* review is not appropriate.  *See Torres v. Pittston Co.*, 346 F.3d 1324, 1333-34 (11th Cir. 2003) (observing that  "fact-and context-specific" considerations – "*e.g.* that there were ongoing exchanges between the parties warranting time extensions, or that the Insurers . . . did issue a determination (albeit one well past the deadline, but before receiving notice of [claimant's] suit)" – might "negate the purpose of applying *de novo* review").

### 3. Step Three: Was the Decision Supported by Reasonable Grounds?

The third step of the *Williams* analysis examines whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made. *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1358 (11th Cir. 2008). As long as there is a reasonable basis for the decision, it "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *White v. Coca–Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008). "If the evidence is close, then the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision." *See Meadows v. American Airlines, Inc.*, 2011 WL 1102774, at * 7 (S.D. Fla. Mar. 24, 2011) (internal quotations and citations omitted).

The court must "begin with the language of the Plan itself" in determining whether the Plan administrator's denial of benefits was arbitrary and capricious. *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1195 (11th Cir. 2007). Here, to receive benefits under the Plan, a participant must be unable to work as a result of a disability. The Plan defines a disability as "an illness or injury, verified though a qualified medical authority . . . which prevents a Pilot Employee from continuing to act as an Active Pilot Employee in the Service of the Employer." (AR 0000006). According to the plan, a disability "will be considered to cease to exist if (1) health is restored so as not to prevent the Pilot Employee from acting as an Active Pilot Employee in the service of the company, (2) verification of such Disability can no longer be established, (3) appropriate medical care is wantonly disregarded by such Pilot Employee." (AR 0000009).

Here, the record shows that Mr. Turner was diagnosed with sleep apnea in 2005 and, after taking disability leave, was able to return to work and successfully perform his job duties while using CPAP therapy. Mr. Turner, however, stopped complying with this CPAP therapy in

2007. Over a period of 182 days between February 25, 2007 and August 25, 2007, Mr. Turner did not use CPAP therapy at all on 116 days. Between October 28, 2007 and January 27, 2008, Mr. Turner did not use CPAP therapy at all on 47 out of 91 days. Because he was not using his CPAP therapy, Mr. Turner's treatment had become ineffective and he was unable to work.

As a result of Mr. Turner's failure to comply with his CPAP therapy, the Plan administrator found that his disability could not longer be verified and that he had wantonly disregarded treatment. Based on the materials available to the plan administrator at the time of his decision, the court find that his decision was neither arbitrary nor capricious.

To be sure, the record shows that Mr. Turner was having trouble tolerating the CPAP therapy. According to Dr. Chediak's notes, Mr. Turner would remove his CPAP mask while he was sleeping, not because of a purposeful decision to reject the treatment, but because of inadvertent gestures. The tolerance issue explains why Mr. Turner had 54 days of noncompliance over a period of 273 days. But issues with tolerance does not explain why Mr. Turner failed to use CPAP treatment at all on a significant number of days.

Mr. Turner argues that American was arbitrary and capricious because "it failed to look at the ultimate conclusions of Dr. Chediak[,] and instead, only emphasized those sections of the medical reports that seemed to provide support for American's denial [while] ignoring all other findings." *See* DE # 16, p. 7. Mr. Turner's argument, however, is belied by the record, which shows that Dr. Chediak's medical observations were considered by Dr. Cowl during his independent medical examination. Indeed, Dr. Cowl's report cites and summarizes Dr. Chediak's findings and conclusions. Additionally, Plan administrators "are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123(2003). Though ERISA and federal regulations "require 'full

14

and fair' assessment of claims . . . these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Id.*

Mr. Turner also argues that American was arbitrary and capricious in failing to contact his treating physician, Dr. Chediak, before making its appeal decision. However, there is no requirement that American or its independent medical examiner contact Mr. Turner's treating physician before issuing a decision. *See Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989)(holding that plan administrator's decision not to contact treating physician was not an abuse of discretion); *Reimann v. Anthem Ins. Companies, Inc.* 2008 WL 4810543, at * 24 (S.D. Ind. Oct. 31, 2008) (holding that "nothing in the statute or regulations requires either [the claim's administrator] or the independent physicians evaluating [claimant's] claim to contact her or her treating physicians"). In addition, although Dr. Chediak could have clarified a couple questions about his notes, the record shows that American had all the information it needed to make a well-informed decision about whether Mr. Tuner was disabled and entitled to benefits.

Mr. Turner argues that American was arbitrary and capricious in relying on the opinions and conclusions its independent medical examiner, Dr. Cowl, because he is not a "qualified sleep medicine specialist" and therefore lacks the requisite training to opine on the issue of sleep apnea. The court disagrees. "[A]n ERISA plan is not required to hire specialists for every claimed malady." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007). Here, it appears that Dr. Cowl is qualified to render his opinions and conclusions. He is a highly credentialed doctor at a well-known hospital, with training in internal medicine, pulmonary

diseases, and preventative medicine. Accordingly, the Plan administrator's reliance on his report was not arbitrary and capricious.[3]

### 4. Final Step: Was there a Conflict of Interest?

The final step in the *Williams* analysis is to determine whether the defendant operated under a conflict of interest that tainted its decision. Here, Mr. Turner contends that a conflict of interest exists because American not only determines the eligibility for disability benefits, but also pays such benefits. Defendant argues that there is no conflict of interest because disability benefits are paid from a trust, which is funded through periodic, non-reversionary contributions.

The Eleventh Circuit has held that no conflict of interest exists where plan benefits are paid out of a trust funded by periodic, non-reversionary payments. *See Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 975-76 (11th Cir. 2008); *White*, 542 F.3d at 858. However, "some courts have interpreted [the law] to institute a broader view of the existence of a structural conflict of interest . . .[,] because even in an actuarially grounded plan, the employer provides the monetary contribution and any money saved reduced the employer's projected benefit obligation." *Meadows*, 2011 WL 1102774, at * 21 (internal citations and alterations omitted).

Here, even if a structural conflict exists, American "has taken active steps to reduce any potential bias – *i.e.*, by using a trust funded through non-reversionary payments and requiring the involvement of an independent medical consulting entity." *Id.* at 22. Further, Mr. Turner has introduced no evidence "of a pattern or practice of unreasonably denying meritorious claims, of evidence that was disregarded, or of the production of only selective medical evidence." *Id.*; *see*

---

[3] Mr Turner complains that Dr. Bettes' initial benefits denial letter failed to inform Mr. Turner what type of information he must submit in his appeal. After carefully reviewing Dr. Bettes' letter, the court finds that this argument is without merit.

Order Granting Defendant's Motion for Summary Judgment
Turner v. American Airlines, Inc.
Case No. 10-80623-CIV-HURLEY/HOPKINS

*Miller v. Prudential Ins. Co. of Am.*, 625 F.Supp.2d 1256, 1266 (noting, even where a conflict is present, a lack of evidence of "malice, self dealing, [or] a parsimonious claims granting history" renders the conflict of low importance). Therefore, any conflict of interest favors Mr. Turner only slightly, and does not affect the court's determination that the Plain administrator's decision was reasonable.

## CONCLUSION

After carefully reviewing the administrative record, the applicable law, and the parties briefs, the court concludes that (1) the denial of Mr. Turner's appeal is entitled to deference on judicial review; (2) the Plan administrator did not act arbitrarily or capriciously in denying Mr. Turner's appeal; and (3) any potential conflict of interest does affect the court's determination that American acted reasonably.

Accordingly, it is **ORDERED** and **ADJUDGED** that:

1. Defendant's motion for Summary Judgment [DE # 9] is **GRANTED**.

2. Pursuant to Fed. R. Civ. P. 58(a), the court will enter final judgment by separate order.

**DONE** and **ORDERED** in Chambers in West Palm Beach, Florida, this 21st day of April, 2011.

_____
Daniel T. K. Hurley
U.S. District Judge